

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-25-00326-CV

———————————————————

IN THE ESTATE OF LONNIE K. LEDBETTER JR., DECEASED

---

On Appeal from the County Court at Law
Hood County, Texas
Trial Court No. P10686

---

Before Sudderth, C.J.; Womack and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

Decedent Lonnie Ledbetter Jr. was wealthy, and much of his wealth was held in trusts. Originally, the trusts were structured such that, upon his death, a significant portion of his wealth would benefit his children, Appellees Lonnie "Trace" Ledbetter III and Kendall Ledbetter Hohmann (together, the Children).

But then Lonnie, at age 81—while mourning the death of his wife of 44 years and enduring the lingering effects of throat cancer—met and married Appellant Tawni Jones-Ledbetter—a woman whose true identity is unclear, as she repeatedly invoked the Fifth Amendment when asked about it during her testimony.[1]

Lonnie died just 16 months into the marriage. But during that time, things changed. Lonnie allowed Tawni to control his finances; he gave her millions of dollars in cash and real property interests;[2] he grew estranged from his Children; he made uncharacteristic business decisions and extravagant purchases; and he signed new wills and trust documents that, among other things, disinherited his Children and appointed Tawni as successor trustee.

The day Lonnie died, his Children filed suit to challenge his new wills and trust documents, and they sought temporary orders to prevent Tawni from squandering

---

[1]When asked whether a certified birth certificate for Andrea Jean Wirshup belonged to her, Tawni invoked her Fifth Amendment right against self-incrimination.

[2]Tawni created a trust in her name—the Jones Ledbetter Family Revocable Trust—and many of the assets transferred to her were placed in that trust.

2

Lonnie's assets while the suit was pending. The trial court enjoined Tawni from controlling certain assets—even to pay for ongoing expenses—and later,[3] on the trial court's own motion "under the rules of equity,"[4] it appointed a receiver to manage the trust assets.[5] *See* Tex. Civ. Prac. & Rem. Code Ann. § 64.001(a)(7).

Tawni appealed both orders.[6] *See id.* § 51.014(a)(1), (4). We recently resolved her first, injunction-related appeal, *see In re Estate of Ledbetter*, No. 02-25-00263-CV, 2025 WL 3559022, at *1–22 (Tex. App.—Fort Worth Dec. 11, 2025, no pet. h.) (mem. op.), and we now turn to what remains of her second: her challenge to the receivership order.[7]

---

[3]Initially, the trial court entered a receivership order within a few weeks of its temporary injunction without holding a separate hearing on the receivership matter. However, the trial court quickly stayed its receivership order and set the matter for a hearing. After the hearing, the trial court entered a new order followed by an amended receivership order.

[4]The amended receivership order reflects that the trial court was acting "on its own motion," and it cites "Tex. Prop. Code § 114.008, Tex. Civ. Prac. & Rem. Code § 64.001, and/or the Court's inherent authority" for support. The trial court also entered findings of fact and conclusions of law.

[5]Specifically, the receivership order extends to "all assets" of Lonnie's trusts— the Community Property Trust, Exempt Family Trust, Non-Exempt Family Trust, and Marital Trust—and "all assets" of Tawni's trust.

[6]Later, the Ledbetter Family Foundation—another player in the mix, whose role we need not detail here—filed a plea in intervention.

[7]Tawni structures her appeal of the receivership order much like she structured her appeal of the injunction; she raises two appellate issues challenging (1) the merits of the order at issue and (2) the trial court's jurisdiction to enter it. On the latter point, Tawni argues—as she did in *Ledbetter*—that the statutory probate judge assigned to the

3

In her sole dispositive issue, Tawni argues that the trial court abused its discretion by appointing a receiver because, among other things, (1) the facts of this case did not warrant a receiver under the rules of equity and (2) the legal authority cited by the trial court did not authorize a sua sponte equitable receivership over the fixed assets at issue. *See* Tex. Civ. Prac. & Rem. Code Ann. § 64.001(a)(7); Tex. R. Civ. P. 695. But the record reveals that, if ever an equitable receivership was factually and legally warranted, it was warranted here. We will affirm.

## I. Standard of Review and Governing Law

Under Section 64.001(a)(7) of the Texas Civil Practice and Remedies Code, a trial court "may appoint a receiver . . . in any . . . case in which a receiver may be appointed under the rules of equity." Tex. Civ. Prac. & Rem. Code Ann. § 64.001(a)(7). Generally, a receiver may be appointed under the rules of equity "when it is necessary to preserve the subject matter of the litigation during the pendency of the suit." *Whitson Co. v. Bluff Creek Oil Co.*, 256 S.W.2d 1012, 1015 (Tex. App.—Fort Worth 1953, writ dism'd); *see Anderson & Kerr Drilling Co. v. Bruhlmeyer*, 136 S.W.2d 800, 806 (Tex. [Comm'n Op.] 1940) (noting that Section 64.001(a)(7)'s predecessor statute "gave authority for the appointment of a receiver 'when no other adequate remedy [wa]s given by law for the

---

case lacked jurisdiction over the Children's trust-related claims and thus lacked the authority to issue the challenged order. We addressed and rejected that jurisdictional challenge in *Ledbetter*, so we need not revisit the issue here. *See Ledbetter*, 2025 WL 3559022, at *6–11 (affirming trial court's subject matter jurisdiction).

protection and preservation of property or the rights of parties therein, pending litigation in respect thereto'" and that amendments "broaden[ed] the right to a receiver" by authorizing it not only under these rules of equity but also in other enumerated instances). And when the facts before the trial court justify such an equitable receivership, the trial court may make the appointment on its own motion. *See Krumnow v. Krumnow*, 174 S.W.3d 820, 828 (Tex. App.—Waco 2005, pet. denied) ("A trial court may on its own motion appoint a receiver without an application by any party when the facts justify the appointment to preserve or protect the property in litigation." (emphasis omitted)); *Cross v. Cross*, 738 S.W.2d 86, 87 (Tex. App.—Corpus Christi–Edinburg 1987, writ dism'd w.o.j.) (similar); *see also Elliott v. Weatherman*, 396 S.W.3d 224, 230 n.4 (Tex. App.—Austin 2013, no pet.) (similar).

Appointing a receiver is a decision entrusted to the sound discretion of the trial court. *Peek v. Mayfield*, No. 02-20-00107-CV, 2021 WL 3205061, at *4 (Tex. App.—Fort Worth July 29, 2021, no pet.) (mem. op.); *A-Med. Advantage Healthcare Sys. v. Shwarts*, No. 10-18-00050-CV, 2019 WL 7374735, at *3–4 (Tex. App.—Waco Dec. 31, 2019, pet. denied) (mem. op.); *Templeton v. RKR Invs. Inc.*, No. 02-18-00024-CV, 2018 WL 2344675, at *3 (Tex. App.—Fort Worth May 24, 2018, no pet.); *see Ledbetter*, 2025 WL 3559022, at *11 (recognizing that a temporary injunction is similarly reviewed for an abuse of discretion). Although the trial court cannot abuse its discretion by ruling arbitrarily, unreasonably, or without supporting evidence, it is free to resolve conflicts in the evidence and to believe one witness over another. *See Ledbetter*, 2025 WL

5

3559022, at *11; *Templeton*, 2018 WL 2344675, at *3. The trial court is the sole judge of the evidence's weight and credibility. *See Ledbetter*, 2025 WL 3559022, at *11 (recognizing in review of temporary injunction that "the trial court judges the credibility of the witnesses and assigns the weight to be given to their testimony"); *Elliott*, 396 S.W.3d at 228 (reviewing receivership order and explaining that "we may not substitute our judgment on factual matters for that of the trial court unless it is clear from the record that the trial court could reach only one decision"); *Lee v. Steele*, No. 01-95-00237-CV, 1995 WL 370264, at *4–5 (Tex. App.—Houston [1st Dist.] June 20, 1995, no writ) (not designated for publication) (reviewing sua sponte receivership order based on evidence offered at temporary injunction hearing and noting that, "[i]n a temporary injunction hearing, the judge is the sole judge of the credibility of the witnesses and the weight to be given their testimony"). We review the trial court's receivership order with this in mind, construing the evidence in a light most favorable to the order. *See Ledbetter*, 2025 WL 3559022, at *11; *Lee*, 1995 WL 370264, at *4–5.

## II. Discussion

Tawni argues that the trial court abused its discretion by appointing a receiver because (1) the facts of this case did not warrant a receivership "under the rules of equity," *see* Tex. Civ. Prac. & Rem. Code Ann. § 64.001(a)(7), and (2) the law did not allow the trial court to rely on the statutory "rules of equity" provision or to appoint a receiver over "fixed and immovable" property on its own motion, *see id.*; Tex. R. Civ. P. 695.

6

## A. The facts supported the receivership.

Tawni's primary complaint is that the facts of this case were not sufficiently extraordinary to warrant a receivership "under the rules of equity." Tex. Civ. Prac. & Rem. Code Ann. § 64.001(a)(7). According to Tawni, rather than appointing a receiver, the trial court should have restored her access to Lonnie's assets so she could preserve them.[8] She argues that Texas courts have limited sua sponte equitable receiverships to extraordinary circumstances in which no lesser remedy is available and that, here, the trial court did not have sufficient evidence of either extraordinary circumstances or the inadequacy of a lesser remedy. The Children dispute whether such findings—of extraordinary circumstances and the inadequacy of a lesser remedy—were necessary.[9] Regardless, assuming that they were, there was evidence to support them.

---

[8]At the time of the trial court's receivership order, Tawni had been enjoined from exercising control over the trust assets, even to pay for ongoing expenses. *See id.* at *12–13, *19–20. And it was undisputed that such expenses were necessary to preserve the trust assets, e.g., by paying for yacht upkeep, for horse maintenance and shows, for taxes, and for employee salaries. *See id.* at *19–20.

[9]The Children argue that the trial court was not required to find extraordinary circumstances, noting that such requirement has been recognized only in cases involving the ex parte appointment of a receiver without notice. *See, e.g., Elliott*, 396 S.W.3d at 229 ("[T]he appointment of a receiver without notice . . . should be exercised . . . only where great emergency or imperative necessity requires it." (internal quotation marks omitted)); *Krumnow*, 174 S.W.3d at 828 ("It has been held that appointment of receivers on ex parte application is to be made only in exceptional and extreme cases."). They also argue that appointing a receiver under Section 64.001 does not require a finding that lesser remedies are inadequate. *Compare, e.g., In re Midland 1235 Inv. Tr.*, No. 11-24-00255-CV, 2025 WL 409042, at *5 n.1 (Tex. App.—Eastland Feb. 6, 2025, orig. proceeding) (mem. op.) (reaffirming court's precedent that "[e]ven if a specific statutory provision authorizes a receivership, a trial court should not appoint a

7

As we held in *Ledbetter*, the trial court was within its discretion to find that Tawni's control over the trust assets posed a threat of irreparable dissipation and that Tawni "would not have adequate assets to satisfy a judgment." *Ledbetter*, 2025 WL 3559022, at *16–18; *cf. A-Med. Advantage Healthcare Sys.*, 2019 WL 7374735, at *4 (affirming order appointing receiver under "rules of equity" when appellants had control over business owned by appellees and had changed the business name and location, refused to provide financial records, failed to pay distributions, and allowed business to be subjected to a tax lien). The trial court heard evidence[10] that

- "Tawni [had] handled Lonnie's finances after the marriage" and such finances had been used to "ma[k]e several large purchases, including buying a jet and a yacht," *Ledbetter*, 2025 WL 3559022, at *17;

- a multi-million-dollar property that Lonnie had owned pre-marriage had, after his marriage to Tawni, been deeded to her personal trust;

---

receiver if another remedy exists, either legal or equitable"), *Elliott*, 396 S.W.3d at 228 ("Even if a specific statutory provision authorizes a receivership, a trial court should not appoint a receiver if another remedy exists at law or in equity that is adequate and complete.")*, and Benefield v. State*, 266 S.W.3d 25, 31 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (similar), *with Bogle v. Bass*, No. 03-23-00491-CV, 2024 WL 3446918, at *6 (Tex. App.—Austin July 18, 2024, no pet.) (mem. op.) ("[W]hen a receiver is appointed pursuant to Section 64.001(a) of the Texas Civil Practice and Remedies Code, the party seeking appointment of a receiver need not show that no other adequate remedy exists." (internal quotation marks omitted)), *and In re Estate of Trevino*, 195 S.W.3d 223, 231 (Tex. App.—San Antonio 2006, no pet.) (similar).

[10]Tawni acknowledges that, in ruling on the receivership issue, the trial court took judicial notice of the evidence offered at the temporary injunction hearing. Although she offhandedly complains of this in a footnote—saying that "[t]here is an argument that the TI hearing could not be considered"—she does not brief the issue, so we need not consider it.

- Lonnie's ranch had been listed for sale for $18 million after his marriage to Tawni, *id.*;

- Tawni had used "[s]everal million dollars" allegedly given to her by Lonnie to purchase a mansion in another state in her name, *see id.*;

- she had "previously filed for bankruptcy in 2012,"[11] *id.* at *18;

- there had been "some question" regarding whether she had fully disclosed her financial information on her bankruptcy schedules, *id.*; and

- she had admitted to "tak[ing] $200,000 from someone else's account without his permission," *id.*

Tawni argues, though, that if the trial court had concerns about her dissipation of funds, it could have protected the trust assets with detailed orders micromanaging her activities; it did not need to resort to the extreme remedy of a receivership. But as the trial court explained at the end of the receivership hearing, the assets at issue involved "multimillion-dollar business[es], and the [c]ourt just d[id not] have the capacity to basically be a finance officer"; it was "[not] functional for the [c]ourt to kind of play accountant in terms of getting receipts, approving [routine] sales, and then coming back with that every time."

More importantly, Tawni's pattern of dishonesty and evasion supported a finding that she was unlikely to comply with micromanaging orders anyway. *See id.* at *22 (observing that "the record reflects that Tawni engaged in deceptive behavior for her

---

[11] An audio recording revealed that Tawni had told Lonnie and the Children that she had filed "a business bankruptcy." But her bankruptcy filings confirmed that she had filed for bankruptcy as an individual.

9

own benefit"). Indeed, even as Tawni's attorneys sought to assure the trial court that she could be trusted to preserve the trust assets, she repeatedly lied to the trial court under oath about mundane, easily disprovable facts:

- Tawni denied—in sworn testimony before the trial court—having told people that she had served in the Swedish military, only to be impeached by an audio recording that documented her telling Lonnie and others that she had served in the "Swedish military through the U.S. Marines." *See id.* at *4.

- She adamantly denied—three times in sworn testimony before the trial court— having told Lonnie that she had sold her aviation company for $90 million, only to be impeached by an audio recording that captured her telling Lonnie and others just that. *See id.*

- She denied—in sworn testimony before the trial court—having taken $200,000 from someone else's account and having admitted to it in a prior deposition, only to be confronted with the deposition testimony in which she admitted that "[she] stole $200,000" from another person's bank account "or took [it] without his permission." *See id.* at *4, *18.

- She denied—in sworn testimony before the trial court—having "sworn under oath in other legal proceedings that [she] ha[d] multiple college degrees,"[12] only to be impeached by prior deposition testimony in which she claimed to have attended the "University of Hawaii," "San Diego State," the "University of Florida in Gainesville," the "University of Boulder," and "Cal State," among others.[13]

---

[12]Tawni admitted that, in reality, she had "no college background." *Ledbetter*, 2025 WL 3559022, at *3.

[13]In another portion of Tawni's trial court testimony, she admitted having falsely represented that she had earned a degree from the Massachusetts Institute of Technology, but she denied telling people that she had earned any other degrees. Again, she was impeached both with her prior deposition testimony—in which she claimed to have attended the various schools listed above—and with copies of her LinkedIn page, which claimed that she had earned a bachelor's degree in engineering from Chalmers University of Technology.

10

- She denied—in sworn testimony before the trial court—having heard of Buxton University, only to be impeached by her testimony from two prior sworn depositions in which she claimed to have earned a "bachelor's degree in business management" and "a master's degree in . . . business administration and finance" from Buxton University.

- When asked "every name [she] ha[d] gone by," she testified—under oath—to three names (Tohnni Jean Jones, Tawni Jean Ledbetter, and Tohnni Jean Giannotti[14]), only to be confronted with a fourth last name that she had used on a previous driver's license (Whitt).[15]

- Later, the trial court took judicial notice of a Michigan Court of Appeals case involving Tawni, and the style of the case listed a fifth name (Tohnni Reed-Giannotti) that Tawni had not mentioned in her sworn testimony before the trial court. *See Jones v. Giannotti*, No. 266568, 2007 WL 2051545, at *1 (Mich. Ct. App. July 17, 2007) (per curiam) (unpublished);[16] *see also Ledbetter*, 2025 WL 3559022, at *3 n.6.

- At another point in Tawni's sworn testimony before the trial court, she was confronted with her birth certificate, which bore a sixth and entirely different name: Andrea Jean Wirshup.[17]

- Tawni denied—in sworn testimony before the trial court—having ever used the name shown on her birth certificate before invoking her Fifth Amendment right against self-incrimination.

Tawni's responses to being caught in her lies were another cause for concern.

Although she occasionally admitted her dishonesty, she just as often attempted to justify

---

[14]An audio recording admitted into evidence documented Tawni telling Lonnie and others that she "was never married to Giannotti."

[15]Tawni testified that she had been married six times, and she admitted that a seventh man had claimed that they had a common law marriage.

[16]Tawni acknowledged "hav[ing] been in a lot of litigation."

[17]An audio recording admitted into evidence captured Tawni telling Lonnie and others that she had "never changed [her] name," even during her previous marriages.

it. *See Ledbetter*, 2025 WL 3559022, at *22 (observing that Tawni "minimized" her lies). For example, to explain her deposition testimony that she had attended the University of Hawaii and San Diego State, she stated that such testimony had not been dishonest because, although she had not enrolled or earned a degree, she had taken "a side class" at each school.[18] *See id.* at *3. As for Buxton University, Tawni claimed that she had, in fact, earned "a physical Master's from Buxton" but that "it turned out to be a far[c]e" and "the University . . . basically took all degrees away," which is why she had denied ever having heard of the school. She similarly denied responsibility for the false representations on her LinkedIn profile, explaining that she "d[id] not handle [her] own social media[; she] ha[d] a social media manager." *See id.* at *3 n5. And when asked about her inconsistent financial representations in her 2012 bankruptcy filings, she testified that her attorneys had prepared the documents and that she "didn't fill any of [it] out" or "have anything to do with th[e] filing[s]." *See id.* at *4 n.8 (noting that, "[o]n the first page of her bankruptcy filing, Tawni estimated that her assets were between $0 and $50,000 . . . [and] her liabilities were between $0 and $50,000," but "[i]n a summary of schedules attached to her petition, her assets were valued at $50,150, and her liabilities were valued at $315,726").

---

[18]When the Children's attorney asked Tawni if, by her logic, "it would have been true [to say that she had attended the universities] if [she] just happened to drive up to [the school] and see it and leave," she confirmed, "[p]robably."

Even when Tawni did not outright lie to the trial court, her answers were evasive. She claimed that she could not remember a number of seemingly memorable events, such as whether her 2012 bankruptcy trustee had accused her of concealing assets and whether her bankruptcy discharge had been set aside.[19] *See id.* at \*4.

Furthermore, she asserted her Fifth Amendment right against self-incrimination in response to more than 20 questions, including questions about her date of birth, her name given at birth, the names of her mother and father, whether she was from Sweden, why her United States passport had been seized, whether she had lied to Lonnie about her age, and whether the date of birth on her marriage license had matched that on her birth certificate.[20] *Id.* at \*2–3. "The trial court was permitted to draw negative inferences from [these] repeated invocation[s] of the Fifth Amendment." *Id.* at \*17; *see* Tex. R. Evid. 513(c).

---

[19]Tawni initially denied having been accused of defrauding the bankruptcy trustee, but when she was questioned further on the issue, she stated that "[t]here was some question as to whether or not . . . [a particular note] was supposed to have been disclosed in her schedules, . . . [but] it was a long time ago and [she] d[id]n't remember." Later, Tawni claimed that, in fact, she had been the one to notify the bankruptcy trustee of the undisclosed note but that she "just didn't do it properly."

[20]The certified birth certificate admitted into evidence—to which Tawni pleaded the Fifth—listed a name and date of birth different from that shown on her marriage license.

The evidence further showed that Tawni's lies, excuses, and evasion were not new. Indeed, she had lied in numerous prior sworn statements dating back several decades. *See Ledbetter*, 2025 WL 3559022, at *18.

In 2007, the Michigan Court of Appeals reviewed a child-custody order involving Tawni's son, and it affirmed the trial court's findings that Tawni "exaggerate[d] on everything"; that she was "a con artist," a "scam artist," and a "psychopathic liar"; and that her life "resemble[d] a 'soap opera.'"[21] *Jones*, 2007 WL 2051545, at *5–8; *see Ledbetter*, 2025 WL 3559022, at *3. And in Tawni's deposition from that case, she had lied about her educational background and invoked the Fifth Amendment in response to basic identity-related questions—two decades before her testimony here.

Tawni downplays this evidence as routine mudslinging, calling it a "smear campaign."[22] But the mud was hers, and it was not so much slung as it was brought to

---

[21]The Michigan Court of Appeals also affirmed the trial court's finding that Tawni had "taken a number of unreasonable positions in th[e] litigation." *Jones*, 2007 WL 2051545, at *8. For example, it described how Tawni's pleadings in the child-custody proceeding had initially identified a second child as a product of her marriage to Louis Giannotti, despite Tawni having obtained a paternity and child-support judgment as to that child against a different man before she married Giannotti. *Id.* at *1.

[22]In Tawni's statement of facts, she offhandedly complains that "[t]hese character assaults should never have come into evidence at all." *Cf.* Tex. R. App. P. 38.1(g) (requiring an appellant's statement of facts to be "without argument"). But she does not identify which portions of the testimonial and documentary evidence she believes should have been excluded, point us to her trial court objections to the evidence's admission, or otherwise brief the issue. *See* Tex. R. App. P. 38.1(i).

light. Tawni's own testimony was a key part of the mud, as she demonstrated her dishonesty for the trial court to witness firsthand. And this evidence supported the trial court's conclusions that a receivership was necessary to preserve the trust assets during litigation and that lesser remedies—such as court orders attempting to micromanage Tawni's actions—were not realistic.[23]

Based on the evidence before the trial court, it was well within its discretion to find that the extraordinary facts of the case warranted a receivership "under the rules of equity." Tex. Civ. Prac. & Rem. Code Ann. § 64.001(a)(7); *see Ledbetter*, 2025 WL 3559022, at *16–18. We overrule this portion of Tawni's dispositive issue.

## B. The law supported the receivership.

Tawni next argues that, even if the facts supported an equitable receivership, the trial court's order (1) could not rely on Texas Civil Practice and Remedies Code Section 64.001(a)(7)'s "rules of equity" provision and (2) could not extend to "fixed and immovable" property without violating Texas Rule of Civil Procedure 695.

---

[23] The trial court's findings of fact confirmed as much; the court found that "Tawni was unwilling to provide the [c]ourt with information that would allow the [c]ourt to understand her true identity," and it listed several examples of Tawni's dishonest and evasive testimony.

15

## 1.    Texas Civil Practice and Remedies Code Section 64.001(a)

First, Tawni asserts that the Civil Practice and Remedies Code provision providing for receiverships "under the rules of equity"—Section 64.001(a)(7)—was not available here. *See* Tex. Civ. Prac. & Rem. Code Ann. § 64.001(a)(7).

Section 64.001(a) identifies certain circumstances in which a receivership is authorized. *See id.* § 64.001(a). It enumerates several types of receivership-warranting cases—e.g., "in an action between partners or others jointly owning or interested in any property or fund"—and it ends with a catch-all provision authorizing a receiver "in any other case in which a receiver may be appointed under the rules of equity." *Id.* Tawni argues that these subsections are mutually exclusive, meaning that a receiver may not be appointed "under the rules of equity" if the case is one of the receivership-warranting legal actions enumerated elsewhere in Section 64.001(a).[24] And according to Tawni,

---

[24]To support her argument, Tawni relies on our sister court's opinion in *Mueller*. *See Mueller v. Beamalloy, Inc.*, 994 S.W.2d 855, 861 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (holding that trial court could not rely on Section 64.001(a)(7)'s "rules of equity" provision "[g]iven the specific grant of authority to appoint a receiver for a corporation under the circumstances listed" in another subsection of Section 64.001(a)); *see also In re Estate of Martinez*, No. 01-18-00217-CV, 2019 WL 1442100, at *3–4 (Tex. App.—Houston [1st Dist.] Apr. 2, 2019, no pet.) (mem. op.) (following *Mueller* but noting split among courts of appeals). She has not cited any case law from this court adopting *Mueller*'s interpretation. *Cf. Anderson & Kerr Drilling Co.*, 136 S.W.2d at 806 (explaining that Section 64.001's predecessor statute was amended in 1887 to "broaden[] the right to a receiver" by "expressly specifying certain cases enumerated in its Subdivisions . . . in which receivers may be appointed . . . without resort to rules of equity"); *Allen v. Allen*, No. 02-17-00031-CV, 2018 WL 547586, at *5–6 (Tex. App.—Fort Worth Jan. 25, 2018, no pet.) (mem. op.) (reviewing receivership order, noting that property was jointly owned, rejecting as unpreserved appellant's argument that Section 64.001(a)(3) governed, and later commenting that the trial court was authorized to

this case was an "action between partners or others jointly owning or interested in any property or fund," thus precluding the trial court from relying on "the rules of equity" catch-all provision. *See* Tex. Civ. Prac. & Rem. Code Ann. § 64.001(a)(3), (7); *Martinez*, 2019 WL 1442100, at *4 (construing subsections as mutually exclusive and holding that "rules of equity" provision did not apply because, in that case, "[t]he administrator, as the representative of the estate, jointly owned the [relevant] property with [the opposing parties] . . . [and t]hat made the underlying case 'an action between . . . others jointly owning . . . property'").

Yet, in the same breath, Tawni undercuts her own argument.[25] To avoid endorsing the "joint[] own[ership]" provision as statutory authorization for the trial court's receivership order, she argues that, although the "joint[] owne[rship]" provision applied enough to preclude the trial court from relying on the "rules of equity" alternative, it did not authorize the receivership because this case was not "an action between partners or others jointly owning or interested in any property or fund." *See*

_____

appoint a receiver to sell the property under the "rules of equity" provision); *Whitson*, 256 S.W.2d at 1014–15 (reviewing suit involving joint owners of property and concluding that receivership was not supported by evidence because neither Section 64.001(a)(3)'s predecessor nor Section 64.001(a)(7)'s predecessor were satisfied).

[25]Tawni acknowledges as much elsewhere in her brief, though she frames the matter differently, stating that we need only consider the trial court's authority to order a receivership "under the rules of equity" if we accept her argument that the "joint[] own[ership]" provision does not apply. *See* Tex. Civ. Prac. & Rem. Code Ann. § 64.001(a).

Tex. Civ. Prac. & Rem. Code Ann. § 64.001(a)(3), (7). In other words, Tawni tries to have her cake and eat it, too. This she cannot do.

If we adopt Tawni's interpretation of Section 64.001(a) and treat the subsections as mutually exclusive, then the substance of Tawni's argument renders her interpretation irrelevant because, by her own account, no other receivership-authorizing subsection applies, so the trial court was not precluded from relying on the "rules of equity" provision. *See id.* § 64.001(a)(7). But if we reject Tawni's interpretation of the statute, then the issue ends there, as the trial court was free to rely on the "rules of equity" provision whether or not one of the other subsections applied. *See id.* Either way, Tawni's challenge to the trial court's reliance on Section 64.001(a)(7)'s "rules of equity" provision fails. *See id.*

## 2.    Texas Rule of Civil Procedure 695

Tawni's second legal challenge to the receivership order fares no better. She claims that Texas Rule of Civil Procedure 695 prohibited the trial court from acting on its own motion to appoint a receiver over "fixed and immovable" property. Tex. R. Civ. P. 695. That Rule provides:

> Except where otherwise provided by statute, no receiver shall be appointed without notice to take charge of property which is fixed and immovable. When an application for appointment of a receiver to take possession of property of this type is filed, the judge or court shall set the same down for hearing and notice of such hearing shall be given to the adverse party by serving notice thereof not less than three days prior to such hearing.

18

*Id.* Tawni emphasizes the Rule's second sentence—the portion directing a trial court to take certain actions "[w]hen an application . . . is filed"—and claims that this language "requires filing an 'application' before a receiver is appointed."[26] *See id.*

But requiring certain actions "[w]hen" an event occurs is not the same thing as requiring that the event occur. *Id.*; *see Krumnow*, 174 S.W.3d at 829–30 (reviewing receivership order and concluding that the facts did not support a sua sponte receivership before then turning to Rule 695 issue based on appellee's subsequent receivership application). Indeed, such construction is inconsistent with the plain language of the Rule, and "[w]e are no more at liberty to ignore the plain language of the Rules than we are to ignore binding precedent." *Allstate Fire & Cas. Ins. v. Dollard*, 679 S.W.3d 279, 289 (Tex. App.—Fort Worth 2023, no pet.) (noting that the Rules of Civil Procedure are "promulgated by the Texas Supreme Court"); *see Mandel v. Lewisville Indep. Sch. Dist.*, 499 S.W.3d 65, 74 (Tex. App.—Fort Worth 2016, pet. denied) ("We apply [R]ules of [C]ivil [P]rocedure in accordance with their plain language.").

Because the plain language of Rule 695 does not require an application for a trial court to appoint a receiver over fixed and immovable property, the trial court did not

---

[26]Tawni raises several related arguments as well, such as claiming that, because there was no application for the receivership, she did not receive three days' notice of an application and the trial court did not require an applicant's bond. We need not address these contingent complaints. *See* Tex. R. App. P. 47.1.

violate the Rule by acting on its own motion. *See* Tex. R. Civ. P. 695. We overrule this final portion of Tawni's dispositive issue.

### III. Conclusion

Given the extraordinary facts of this case, the trial court was well within its discretion to appoint a receiver on its own motion "under the rules of equity." Tex. Civ. Prac. & Rem. Code Ann. § 64.001(a)(7). We affirm the receivership order. *See* Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: February 5, 2026

20